MILLBRAE ASSOCIATION FOR RESIDENTIAL SUR-
VIVAL et al., Plaintiffs and Appellants, v. CITY OF
MILLBRAE et al., Defendants; JOHN B. COCK-
CROFT, JR., et al., Interveners and Appellants; JAMES
M. HIMEL, Movant.

224

George Corey for Plaintiffs and Appellants.

William R. Edgar and Jackson & Adams for Interveners and Appellants.

James M. Himel, in pro. per., for Movant.

MOLINARI, P. J.—Plaintiffs[1] and interveners[2] appeal from a judgment validating certain zoning ordinances and a "Project General Plan" applicable to interveners' property but invalidating the "Project Precise Plan" submitted for interveners' proposed real estate development.[3] In conjunction with the appeal we are called upon to decide certain motions which have heretofore been presented to us, the nature of which we shall discuss after delineating our scope of review and the facts of the instant case.

## Scope of Review

Since these appeals are taken on the clerk's transcript alone, the following rules of review apply: the record before us consists properly of only the judgment, findings of fact and conclusions of law in support thereof, and the pleadings; we are not concerned with evidence taken in the trial court, either orally or through the admission of exhibits (whether or not said exhibits are incorporated into the clerk's transcript); we presume that there was substantial evidence to support the findings of the trial court; and we are confined to the question whether the judgment is supported by the findings and whether reversible error appears upon the face of the record. (*Crummer* v. *Zalk*, 248 Cal.App.2d 794, 797 [57 Cal.Rptr 185]; *Pfleg* v. *Pfleg*, 168 Cal.App.2d 53, 55-56 [335 P.2d 131]; *Tibbets* v. *Robb*, 158 Cal.App.2d 330, 337 [322 P.2d 585]; *White* v. *Jones*, 136 Cal.App.2d 567, 569, 571 [288 P.2d 913].) Further, since none of the parties objected to the findings or conclusions of the court nor requested specific findings, we must resolve all conflicts and ambiguities in the findings in support of the judgment as well as infer logi-

---

[1] The plaintiffs are the Millbrae Association For Resential Survival, an unincorporated association, and a number of named individuals.

[2] The interveners are John B. Cockcroft, Jr., Alan Hedden, J. Richard Shelley and Lee Ham, copartners doing business under the name of "Skyline Development Co."

[3] The defendants, City of Millbrae, its City Administrator, City Engineer, City Clerk and City Building Inspector are not parties to this appeal.

cal and reasonable findings in support thereof. (Code Civ. Proc., § 634; *Auer* v. *Frank,* 227 Cal.App.2d 396, 406 [38 Cal.Rptr. 684, 8 A.L.R.3d 1108]; *Canadian Indem. Co.* v. *Motors Ins. Corp.,* 224 Cal.App.2d 8, 17 [36 Cal.Rptr. 159]; *Thornton* v. *Stevenson,* 185 Cal.App.2d 708, 715 [8 Cal.Rptr. 603]; *Reinsch* v. *City of Los Angeles,* 243 Cal.App.2d 737, 746 [52 Cal.Rptr. 613]; *People* v. *Coit Ranch, Inc.,* 204 Cal.App. 2d 52, 64-65 [21 Cal.Rptr. 875]; *Schaefer* v. *Berinstein,* 180 Cal.App.2d 107, 124-125 [4 Cal.Rptr. 236].)

## Findings of Fact

The specific findings of fact of the trial court were as follows: in 1959 the City Council of the City of Millbrae duly adopted and enacted Ordinance No. 161, which amended the basic zoning ordinance of the City of Millbrae (Ordinance 42) to provide for a classification of land use known as Planned Unit Development or PD District. In 1960 the Trousdale Construction Company filed with the City of Millbrae an application to rezone approximately 52 acres of R-1 land (single family residence) to PD district. The "Project General Plan" accompanying said application divided said 52 acres of land into 8 sections, numbered from Section A to Section I. After due notice and public hearings on the question, the City Planning Commission adopted Resolution No. 12 approving the rezoning of all 8 sections of the property described in the application and the "Project General Plan" from R-1 to PD zoning. The City Council, after giving due notice and holding public hearings on the zoning described in Resolution No. 12 and in the accompanying "Project General Plan," adopted Ordinance No. 182 on August 1, 1961, rezoning only Section A (approximately 13 acres) of the total property from R-1 to PD district. The "Project General Plan" submitted at that time provided for construction of seven six-story apartment buildings on the property.

The City Council did not refer its rezoning of Section A back to the City Planning Commission for report and recommendation. The trial court found that public hearings held by the City Council, the public notices thereof, and the newspaper publicity during the enactment of Ordinance No. 182 caused plaintiffs to become aware of said procedural defect, "if it was a defect."

On April 6, 1962, interveners acquired an option to purchase the subject property including the rezoned Section A.

Shortly thereafter the then owners of the property applied to the City to amend the "Project General Plan" described in Ordinance 182 to provide for three high-rise apartment buildings and seven quadplexes instead of the seven six-story buildings originally contemplated. The City Planning Commission held public hearings on the amendment and then adopted Resolution No. 22 approving the changes subject to four conditions, which were, briefly, that Vallejo and Connejo Drives be connected; that off-street parking be provided in a ratio of .75 to 1; that a water tank be provided; and that the developer incorporate into the PD district property which he owned immediately east of the district. After due notice was given and public hearings held, the City Council on August 7, 1962, approved the amendment of the "Project General Plan" subject to the foregoing conditions and requested interveners to present their "Project Precise Plan" reflecting the changes.

In order to comply with the foregoing four conditions of the "Amended Project General Plan," interveners applied for the rezoning of approximately 3.75 acres of land adjacent to the subject property, which rezoning was duly accomplished on February 19, 1963, with the enactment of Ordinance 202. Further, the owners of the property deeded a portion thereof to the City of Millbrae for water tank purposes and on February 5, 1963, interveners, the City, and a construction company entered into an agreement for construction of the water tank, under which interveners were to bear 77 percent of the cost, less certain amounts to be refunded in three installments, and the tank would service the property described in Ordinances No. 182 and No. 202 plus other property in the City of Millbrae. The City Council duly passed Resolution 63.7 authorizing the execution by the City of the foregoing agreement. The trial court found that the resolution and the agreement and contract executed pursuant thereto did not substantially change or alter a former water agreement executed between the City of Millbrae and the Trousdale Construction Company on January 18, 1955.

The trial court specifically found that all public hearings, notices, and other required procedural steps for the adoption of Ordinances 161, 182 and 202 have been accomplished and held in full compliance with the State Planning Act, the zoning ordinances of the City of Millbrae, and other relevant

laws and statutes, and that the "Amended Project General Plan" of August 7, 1962 was adopted in full compliance with Ordinance 161 and does not violate the State Planning Act or any City of Millbrae zoning ordinances. The court further found that Ordinance 202 did not establish a separate PD district of 3.75 acres but merely constituted an addition to the existing PD district created under Ordinance 182.

On February 20, 1963, pursuant to the terms of Ordinance 161, the owners of the property filed with the City Planning Commission an application for approval of their "Project Precise Plan." At four regular public meetings, the Planning Commission reviewed and ultimately, on April 22, 1963, approved the Precise Plan. No public hearings as such were held, although local newspapers carried stories about the proceedings. While the Planning Commission was reviewing the Precise Plan, the City Council requested copies thereof and reviewed said plans at· a public meeting on March 19, 1963, but took no formal action thereon. The Precise Plan was approved April 22, 1963, and changed the "Amended Project General Plan" of August 7, 1962, as follows: seven apartment units were added to the high-rise buildings; part of a proposed pitch and putt golf course was eliminated; parking spaces were increased; and two of the three high-rise buildings, buildings A-1 and A-2, were substantially relocated. The Precise Plan relocated building A-2 from 70 feet distant to 35 feet distant from the property line of plaintiffs Robert J. and Patricia M. Lloyd, who had made a deposit on their property adjacent to the PD district around February of 1963 and moved into their residence in February 1964.

On May 27, 1963, the subject property was conveyed to interveners. On September 27, 1963, intervener Lee E. Ham, City Engineer of the City of Millbrae since May 4, 1954, delivered a letter to City Hall disclosing his proprietary interest in the subject property. On October 1, 1963, the City and interveners entered into an agreement providing for interveners to buy from the City certain police and fire equipment required for the high-rise buildings; for construction at interveners' expense of a new 12-inch water line; and for conversion of a gas-driven water pump in the City of Millbrae to a motor-driven pump. On that same date, the City Council approved the final subdivision map of the project. Lee E. Ham resigned as City Engineer on February 4, 1964.

The court found that "the position of said Lee E. Ham as City Engineer and as part owner of the subject property and as engineer for the developer in and of itself amounts to a conflict of interest"; but that there was no evidence of wrongdoing, fraud, undue influence, or illegality on the part of any of the interveners including Lee E. Ham, nor was there evidence of injury or loss to the City of Millbrae. The court found the conflict to consist in the facts that Lee Ham was City Engineer from May 4, 1954, to February 4, 1964; acquired a potential interest in the subject property on April 6, 1962, and an actual deed interest as of May 8, 1963; did not disclose his interest until September 27, 1963; and during all times prior to his resignation on February 4, 1964, acted as engineer for the interveners as well as for the City of Millbrae.

In April 1964, the City Council approved and executed agreements with interveners providing for public improvements in the project such as curbs, gutters, sidewalks, sewers, and like facilities, as well as an agreement for retention and maintenance by interveners of certain parking and landscaping areas. Prior to the commencement of the instant action (on February 19, 1965), interveners had constructed two of the quadplexes provided for in the Precise Plan; the final subdivision map, entitled "Millbrae Towers," had been recorded (on August 10, 1964); the City Council had approved and accepted for maintenance the public improvements on December 15, 1964; and interveners had applied for permits for another quadplex and for the foundations for high-rise building No. B. Interveners had expended approximately $600,000 in developing the property, including installation and dedication of public streets and utilities, street and site grading, preparation of architectural and engineering plans, off-site improvements, and the erection of the two quadplexes. The court specifically found that interveners had substantially performed all conditions imposed in the agreements entered into between them and the City.

As to the Precise Plan, the court found that certain changes from the "Amended Project General Plan" constituted substantial changes, the nature of which we set out in the footnote.[4] The court also found that the Precise Plan was adopted

_____

[4] "(a) Seven apartments units were added to the high-rise apartments;
"(b) A greater portion of the proposed pitch and putt golf facilities shown on the amended General Plan was eliminated and parking spaces were added instead;

by the City Planning Commission without public hearings or notice; that plaintiffs were not aware of the foregoing changes from the "Amended Project General Plan"; and that plaintiffs did not avail themselves of nor exhaust their administrative remedies contesting the approval of the Precise Plan.

### Conclusions of Law

Based on the foregoing factual findings, the court made the following conclusions of law: (1) Ordinances 161, 182, 202, and the Amended Project General Plan of August 7, 1962, are all valid; (2) PD zoning as provided for in Ordinance 161 does not violate the State Planning Act nor any zoning ordinance of the City of Millbrae; (3) The Precise Plan of April 22, 1963, is invalid as not in accordance with the Amended Project General Plan and is an attempt by the Planning Commission at de facto zoning; (4) The City is enjoined from issuing any building permits until the City Planning Commission approves a Precise Plan in substantial compliance with the Amended Project General Plan of August 7, 1962. Additionally, the court concluded that in view of interveners' substantial performance of all the conditions of their agreements with the City, and in view of the fact that the City was satisfied with the services of Lee E. Ham and commended him upon his resignation, all of said agreements are valid and subsisting. Judgment was entered in accordance with these conclusions. Furthermore, although the court found that there was no evidence that the failure of the City Council to refer its rezoning of Section A back to the City Council had damaged plaintiffs, this "finding" amounted to a conclusion of law, as did the "findings" that, if such a referral was required, plaintiffs were guilty of laches for failing to pursue their remedies until two years after the adoption of Ordinance 182; that defendants and interveners had materially changed their position to their detriment in reliance on plaintiffs' lack of action; and that plaintiffs were estopped from attacking the validity of the ordinance. Moreover, although labeled as a "finding," the trial court concluded that, although plaintiffs did not avail themselves of nor exhaust their remedies contest-

"(c) The location of two of the three high-rise apartments, namely, Buildings A-1 and A-2 were moved substantially in the following respects:
"(1) Building A-2 was moved from 70 feet distant from the property line of plaintiffs ROBERT LLOYD and PATRICIA LLOYD to a distance of 35 feet from said property line; and
"(2) Buildings A-1 and A-2 were moved substantially into the additional property zoned PD district by Ordinance 202."

ing the approval of the Precise Plan, they were not barred by laches or estopped from contesting the invalidity of the changes made in the Precise Plan, because no public hearing or other notice was given as to such changes.

## The Motions

Plaintiffs have filed a "Motion to Strike Interveners Briefs and to Dismiss Interveners as Appellants and Respondents in this Appeal," and a "Motion to Strike, Further Motion to Dismiss." These two related motions ask this court, in essence, to dismiss the instant appeal of interveners because interveners have dissolved their partnership and sold their interests in the subject property. In support of these motions plaintiffs offer certain documentary evidence and interveners offer similar evidence on their behalf. The effect of these motions is to request that we take additional evidence on this appeal. ▮▮▮ Although this court has power to take such additional evidence (Cal. Rules of Court, rule 23(b)) and should dismiss an appeal when such evidence shows that events occurring after judgment have rendered the appeal moot (*Paul* v. *Milk Depots, Inc.*, 62 Cal.2d 129, 132, 134 [41 Cal.Rptr. 468, 396 P.2d 924]; *Consolidated etc. Corp.* v. *United etc. Workers*, 27 Cal.2d 859, 862, 865 [167 P.2d 725]; *Goldman* v. *County of Santa Barbara*, 203 Cal.App.2d 454, 457-458 [21 Cal.Rptr. 532]), appellate courts are generally reluctant to take such evidence. (*Crofoot Lumber, Inc.* v. *Lewis*, 210 Cal.App.2d 678, 681 [27 Cal.Rptr. 443]; see *Bassett* v. *Johnson*, 94 Cal.App.2d 807, 811 [211 P.2d 939].) In the instant case we are satisfied that the proffered evidence does not compel the conclusion that the matters alleged by plaintiffs have rendered the appeal moot. The dissolution of the partnership is without significance on this appeal since the partnership is not a legal entity and the partners intervened in this lawsuit in their individual capacities. (See *Reed* v. *Industrial Acc. Com.*, 10 Cal.2d 191, 192 [73 P.2d 1212, 114 A.L.R. 720]; *Rudnick* v. *Delfino*, 140 Cal.App.2d 260, 265-267 [294 P.2d 983].) With respect to the sale of the land it appears that the retention of the existing zoning of the land is vital to the interveners, who have sold the land under a contract to continue the prosecution of the appeal, and the general partner of the vendee is one of the partners in the vendor firm. We are impressed, moreover, with the authorities that support interveners' contention that when one acts under compulsion or coercion in compliance with a judgment, he

does not lose his right of appeal from that judgment. Interveners alleged that under economic compulsion they were forced to seek a new Precise Plan and start construction under it. Accordingly, we deem it proper that this appeal be decided on its merits and that plaintiffs' motions be denied.

## Contentions

Plaintiffs appeal from that portion of the court's judgment that validated the zoning of interveners' property as PD and upheld the subdivision of said property pursuant to interveners' "Amended Project General Plan" of August 7, 1962. The two principal grounds urged for plaintiffs' appeal are, one, that the zoning of interveners' property as PD did not comply with procedural requirements of law; and two, that since intervener Lee Ham was a public officer (city engineer) of the City of Millbrae, a part owner of the subject property, and engineer for interveners, a conflict of interests results which renders void various contracts between the City and interveners pertinent to the subject property.

Interveners appeal from that part of the judgment that invalidates their "Project Precise Plan" of April 22, 1963, and enjoins the City of Millbrae from issuing building permits pursuant to said Precise Plan. They contend, first, that the trial court erred in finding that the approval of the Precise Plan amounted to de facto rezoning and hence was invalid for lack of notice and hearing that would be required to accomplish a change in zoning. They also contend that their expenditure of over $600,000 has given them vested rights in the Precise Plan which override any procedural irregularities that have occurred; that laches and estoppel bar plaintiffs from attacking the Precise Plan; and finally, that the court erred in refusing to apply laches and estoppel against plaintiffs because of the conflict of interest consisting of Lee Ham's ownership of an interest in the subject property simultaneously with his being employed as engineer of the City of Millbrae.

## Plaintiffs' Appeal

A. *Validity of the Zoning of Interveners' Property to PD District*

Plaintiffs argue that under former Government Code section 65655,[5] in force at the time of the proceedings which are

[5] This section was repealed in 1965 and substantially reenacted as Government Code section 65857. We note, moreover, that in 1965 substantial changes and reenactments were made in the state laws pertaining to local planning. (See Gov. Code, §§ 65100-65700.)

the subject of this action, when the Planning Commission approved 52 acres for PD zoning and the City Council in Ordinance 182 rezoned only Section A (13 acres) of that property to PD, the City Council was required to refer said rezoning back to the Planning Commission for report and recommendation. The subject statute then read as follows: "Change in precise plan or regulation by legislative body: Procedure. The legislative body shall not make a change in any proposed precise plan, regulation, or amendment thereto recommended by the planning commission until the proposed change has been referred to the planning commission for a report and a copy of the report has been filed with the legislative body." Thus, plaintiffs contend that zoning only 13 acres of the property to PD district constituted a change in the recommendation of the planning commission that the entire 52 acres be zoned PD. They contest the conclusion of the trial court that referral back was not necessary because the change merely resulted in an "ordinance of lesser scope than that which the City Council might have enacted in the first instance."

Insofar as pertinent to this case, the controlling procedure to be followed in amending a zoning ordinance is to be found in former sections 65800-65805 of the Government Code.[6] Section 65803 provided: "Except as otherwise provided in this article, a zoning ordinance shall be initiated and adopted in the same manner as a *precise plan,* pursuant to Chapter 3. This section does not require the adoption of a master plan prior to either the initiation or adoption of a zoning ordinance." (Italics added.) Section 65804, in pertinent part, provided: "Except as otherwise provided in this article, an amendment to a zoning ordinance which amendment changes any property from one zone to another . . . shall be initiated and adopted in the same manner as required for the initiation and adoption of the original zoning ordinance."

In view of these statutes it is clear that at the times applicable to the instant case, zoning ordinances were required to be initiated, adopted, and amended pursuant to the procedure for the adoption of precise plans provided for in former sections 65650-65659. In the present case, pursuant to section 65804, the procedure for amending the zoning ordinance

---

[6]Unless otherwise indicated, all statutory references hereinafter made are to the Government Code.

(Ordinance 42), rezoning 52 acres from R-1 to PD, followed the procedures prescribed for the adoption of precise plans. Our inquiry, therefore, is whether the rezoning of only 13 acres by the City Council without referral back to the Planning Commission was a jurisdictional defect in violation of section 65655 which renders Ordinance 182 null and void.

In the instant case the Planning Commission approved the rezoning of eight separately designated sections, each containing specific acreage, from R-1 to PD. These rezonings were submitted by the Planning Commission to the City Council with a recommendation that they be adopted but the Council saw fit to rezone only one of the sections. Accordingly, since the Council could have rezoned all eight of the sections the ordinance rezoning Section A (Ordinance No. 182) was merely an ordinance of lesser scope than that which it might have enacted. (See *Bailey* v. *County of Los Angeles,* 46 Cal.2d 132, 138-139 [293 P.2d 449].) The Council, therefore, did not make any change with respect to the recommended rezoning of Section A but adopted the rezoning of that section as recommended by the Planning Commission. In our view, the failure of the Council to rezone the other seven sections as recommended by the Planning Commission did not amount to a ''change'' in the Commission's recommendations since each parcel was the subject of separate rezoning. Therefore, since no change was made by the City Council with respect to the recommended rezoning of Section A a referral to the Planning Commission pursuant to former section 65655 was not required.

As already noted, the trial court found, moreover, that even if a referral to the Planning Commission was necessary, the plaintiffs were aware of such procedural defect, if it was a defect, and that they were guilty of laches in failing to pursue their remedies until the filing of the instant action some two years after the adoption of Ordinance 182, during which time interveners materially changed their position by purchasing the property and launching its development. The question of laches must be determined in each case upon the basis of its facts and in the absence of a palpable abuse of discretion the trial court's finding on that issue will not be disturbed on appeal. (*Williams* v. *Marshall,* 37 Cal.2d 445, 455 [235 P.2d 372]; *Beckett* v. *Kaynar Mfg. Co., Inc.,* 49 Cal.2d 695, 700 [321 P.2d 749]; *DaSilva* v. *Reeves,* 215 Cal. App.2d 172, 175 [30 Cal.Rptr. 81].) In the instant case there

is ample evidentiary support for the trial court's finding that plaintiffs did not act promptly and were guilty of laches, particularly in view of the rule that the right to question the validity of a statute must be urged at the earliest opportunity or it will be considered as waived. (*Hershey* v. *Reclamation District No.* 108, 200 Cal. 550, 564 [254 P. 542]; *Jenner* v. *City Council,* 164 Cal.App.2d 490, 498 [331 P.2d 176].) [7]

B. *Effect of Conflict of Interest*

Plaintiffs next contend that the fact that Lee Ham was City Engineer, engineer for interveners, and a part owner of the subject property, renders null and void all contracts with respect to said property entered into between interveners and the City of Millbrae before Ham's resignation, such as the agreement for the construction of the water tank and the contracts to purchase police and fire equipment for the high-rise buildings, to construct at interveners' expense a new water line; and to convert a water pump. (Clearly, plaintiffs may not challenge the contracts entered into in April 1964, with respect to public improvements in the project, since Lee Ham resigned on February 4, 1964.)

Plaintiffs rely on Government Code section 1090, which reads: "Members of the Legislature, state, county, special district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, special district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity." A contract or transaction entered into in violation of this statute is invalid. (Gov. Code, § 1092; *Terry* v. *Bender,* 143 Cal.App.2d 198, 206 [300 P.2d 119]; *People* ex rel. *Mosk* v. *Barenfeld,* 203 Cal.App.2d 166, 172 [21 Cal.Rptr. 501].)

Under Government Code section 1090 the test is whether the officer or employee participated in the making of the con-

[7]In view of the conclusion reached by us that the judgment of the trial court validating Ordinances No. 182 and No. 202 must be sustained, we need not consider the argument of interveners that as an alternative basis of the judgment the enactment of Ordinance No. 231 during the pendency of this appeal has rendered moot the issue of the validity of Ordinances 182 and 202. Moreover, the applicability of Ordinance 231 to the instant case was obviously not before the lower court and we have not been requested to take judicial notice of said ordinance. A matter that has not theretofore been judicially noticed in the action may not be judicially noticed by the reviewing court if there has not been a compliance with Evidence Code, section 455, subdivision (a). (Evid. Code, § 459, subd. (c).)

tract in his official capacity.[8] (*Stigall* v. *City of Taft*, 58 Cal.2d 565, 568-571 [27 Cal.Rptr. 441, 375 P.2d 289]; *Old Town Dev. Corp.* v. *Urban Renewal Agency*, 249 Cal.App.2d 313, 328 [57 Cal.Rptr. 426]; see *Bradley Co.* v. *Ridgeway*, 14 Cal.App.2d 326, 335 [58 P.2d 194]; *City of Oakland* v. *California Constr. Co.*, 15 Cal.2d 573, 577 [104 P.2d 30].)

Although section 1090 refers to a contract "made" by the officer or employee, the word "made" is not used in the statute in its narrower and technical contract sense but is used in the broad sense to encompass such embodiments in the making of a contract as preliminary discussions, negotiations, compromises, reasoning, planning, drawing of plans and specifications and solicitation for bids. (*Stigall* v. *City of Taft*, *supra*, at pp. 569, 571.) Such construction is predicated upon the rationale that government officers and employees are expected to exercise absolute loyalty and undivided allegiance to the best interests of the governmental body or agency of which they are officers or employees, and upon the basis that the object of such a statute is to remove or limit the possibility of any personal influence, either directly or indirectly which may bear on an officer's or employee's decision. (*Stigall* v. *City of Taft*, *supra*, at p. 569.) In the instant case we note that the word "employee" was added to Government Code section 1090 by amendment effective September 20, 1963. The subject water tank agreement was entered into before said amendment, i.e., on February 5, 1963, whereas the other agreements were entered into subsequent to the amendment, i.e., on October 1, 1963. It has been held that the statute prior to the amendment applied only to officers and not employees. (*County of Marin* v. *Dufficy*, 144 Cal.App.2d 30, 34-36 [300 P.2d 721].) It has also been held, however, that a person employed in an advisory capacity came within the purview of the statute. (*Schaefer* v. *Berinstein*, 140 Cal.App.2d 278, 291 [295 P.2d 113].)

The trial court here made no specific findings as to whether or not Ham participated in the making of the contracts in any capacity, although in its conclusions it states that the contracts are valid because interveners have substantially performed them and because the City appeared to have been satisfied with Ham's services. None of these facts are relevant to the question whether the subject contracts are

---

[8]Interveners do not contest the trial court's finding that Ham had an interest in the subject contracts within the contemplation of the statute.

void, and similarly the court's factual findings that there was no fraud or unfairness are likewise irrelevant, since it is not necessary to show fraud, dishonesty, or loss to the public entity in order to invalidate contracts under Government Code section 1090. (E.g., *Schaefer* v. *Berinstein, supra,* 140 Cal.App.2d 278, 290; *Stockton Plumbing & Supply Co.* v. *Wheeler,* 68 Cal.App. 592, 602-603 [229 P. 1020]; *Miller* v. *City of Martinez,* 28 Cal.App.2d 364, 368-369 [82 P.2d 519]; *County of Shasta* v. *Moody,* 90 Cal.App. 519, 523-524 [265 P. 1032].)

The only finding made by the court on the issue of conflict of interest is that Ham's position as City Engineer and as part owner of the subject property and as engineer for the developer *"in and of itself* amounts to a conflict of interest." (Italics added.) This finding, in turn, was predicated upon the specific findings that Ham was City Engineer from May 4, 1954 to February 4, 1964; that he acquired a "potential interest" in the subject property on April 6, 1962 and an actual "deed interest" therein on May 8, 1963; and that he did not disclose his interest until September 27, 1963. These findings do not permit any inference that Ham did or did not participate in the making of said contracts in his official capacity.

In cases of this nature full and complete findings are required on all material issues, and failure to object to the findings is not a waiver of failure to find on a material issue. (*Auer* v. *Frank, supra,* 227 Cal.App.2d 396, 406; *McKinley* v. *Buchanan,* 176 Cal.App.2d 608, 612 [1 Cal.Rptr. 573]; *Sharove* v. *Middleman,* 146 Cal.App.2d 199, 201 [303 P.2d 900].) Further, we cannot infer findings in support of the judgment from speculation or possibilities, but may only infer findings that result by necessary implication from the express findings that are made. (*Branche* v. *Hetzel,* 241 Cal.App.2d 801, 810 [51 Cal.Rptr. 188]; *Bley* v. *Ad-Art, Inc.,* 250 Cal.App.2d 700, 712 [59 Cal.Rptr. 26].) What is more, failure to find on a material issue is clearly reversible error when the court has openly indicated its misconception of the law. (*Mitidiere* v. *Saito,* 246 Cal.App.2d 535, 537-539 [54 Cal.Rptr. 665].)

Here there are no express findings from which we may infer that Ham did not participate in his official capacity in the making of said contracts. Also, there is every indication that the trial court erroneously believed that the good faith of interveners, the fairness of the contracts, or interveners' sub-

stantial performance could serve to validate said contracts even if they were void under Government Code section 1090 and hence against public policy. (*Miller* v. *City of Martinez, supra,* 28 Cal.App.2d 364, 367-368; *City of Oakland* v. *California Constr. Co., supra,* 15 Cal.2d 573, 576-577.) Accordingly, that part of the modified judgment declaring valid all agreements entered into between the City of Millbrae and interveners pertaining to the subdivision of the subject property must be reversed and the case remanded for further findings, and, if necessary, retrial of the issue whether the agreements entered into between the City and interveners prior to Ham's resignation fall within Government Code section 1090.[9]

## Interveners' Appeal[10]

A. *The Validity of the Planning Commission's Approval of Interveners' "Project Precise Plan"*

As previously noted, the Planning Commission approved interveners' "Project Precise Plan" on April 22, 1963, without holding public hearings as such and without the City Council taking any formal action, although the City Council did request copies of the Plan and reviewed the same at a public meeting on March 19, 1963. The trial court found that the respects in which the "Project Precise Plan" deviated from the "Amended Project General Plan" constituted substantial changes. The question for our decision is whether the trial court erred in concluding that the Precise Plan is invalid as an attempt by the Planning Commission at de facto rezoning.

Before proceeding with the discussion of the issue presented it would be well to define the meaning of the terminology used in the instant case. The parties concede that the subject "general plan" referred to in the Millbrae ordinance is not

---

[9]In the event the trial court finds said contracts, or any of them, to be void it may have to determine whether, under the doctrine of *Gutosky* v. *City of Garden Grove,* 223 Cal.App.2d 765, 769, 770 [36 Cal.Rptr. 181], interveners would nevertheless be entitled to retain land either dedicated for public improvements involved in the contracts, or deeded to the City pursuant to the subject agreements.

[10]Interveners appeal from that portion of the modified judgment of the trial court which reads: "Project Precise Plan approved by the Planning Commission on April 22, 1963, is invalid since it is not in accord with the Amended Project General Plan dated August 7, 1962 and the City of Millbrae and the City Building Inspector thereof are hereby enjoined and restrained from issuing permits for buildings pursuant to said invalid Project Precise Plan dated April 22, 1963."

the master or general plan referred to in the Government Code. (Former §§ 65460-65555.) Section 65460 described a general or master plan as ''a comprehensive, long-term general plan for the physical development of the City, . . .'' The record discloses that such a master or general plan was, within the meaning of the Government Code, adopted by the City of Millbrae following the adoption of Ordinance 161 amending the basic zoning law, but prior to the adoption of Ordinance No. 182 rezoning the subject property from R-1 to PD. This master plan showed that the property which became the subject of Ordinance No. 182 was designated as being ''high density, multi-family residential property.''

The ''general plan'' with which we are here concerned, as conceded by the parties, is that provided for in section 3.7-E-3 of Ordinance No. 161 providing for the initiation of a change of classification to PD district. In order to have property rezoned PD an applicant must, in accordance with the procedure for securing an amendment to the zoning ordinance, submit to the Planning Commission and to the City Council a general plan of his proposed development, on the basis of which plan the City Council must approve or disapprove the application. (Ord. 161, §§ 3.7-E-3, 3.7-E-4.) Said general plan must show the proposed site of the project and ''the character and use of adjoining property; the general size, location and use of all proposed buildings and structures to be placed on the site; the location and dimensions of streets, parking areas, open areas and other public and private facilities and uses.'' (Ord. 161, § 3.7-E-3.)

After having secured the rezoning of his property as PD, the applicant may nevertheless not begin development of the site unless he secures approval of a ''Precise Plan'' which must include certain specified data such as the total development plan, engineering site plans and landscaping plans, architectural drawings and/or sketches demonstrating the design and character of the proposed structure, uses and facilities, and other pertinent information necessary to determine whether the contemplated arrangements or use make it desirable to apply regulations and requirements differing from those ordinarily applicable. (Ord. 161, §§ 3.7-E-4, 3.7-E-7.) In order to grant approval of a ''Precise Plan,'' the Planning Commission must make certain findings indicating that the proposed development is in conformity to certain

specified standards.[11] Under the ordinances the approval of this "Precise Plan" is wholly delegated to the Planning Commission, and the holding of public meetings thereon is optional. (Ord. 161, §§ 3.7-E-6 to 3.7-E-10.)

The parties are also generally in accord that the "Precise Plan" referred to in the Millbrae ordinance is not the "Precise Plan" provided for in the Government Code (former §§ 65600-65659), but a more detailed plan supplemental to the precise plan provided for in the state law. It should be here noted that the precise plan provided for in the state statutes must be adopted by the city legislative body upon recommendation of the plan by the planning commission following a public hearing upon notice by the commission. (Former §§ 65650-65654.) The Millbrae "Precise Plan," on the other hand, need only be considered by the Planning Commission with or without a public hearing at the commission's option. (§ 3.7-E-6 of Ord. 161.) It should also be noted that neither party challenges the validity of the ordinance and the "precise plan" procedure therein provided. The parties, moreover, seem to be in agreement that the "general plan" referred to in the Millbrae ordinance is, in essence, the "precise plan" referred to in the Government Code, and that the "precise plan" provided for in the ordinance is merely a supplement to and within the purview of the "general plan."

Adverting to the question presented we apprehend that the issue is whether the action of the Planning Commission in approving a "Precise Plan" for PD districts under the Millbrae ordinance is the equivalent of the issuance of a conditional use permit or the granting of a variance, or whether, instead such action is tantamount to rezoning the property involved. Essentially, the parties agree that if the approval of such a Precise Plan is the same sort of administrative function as the issuance of a conditional use permit or the granting of a variance, then the Planning Commission has the

[11]These findings are as follows:

"1. That the proposed development will produce an environment of stable and desirable character, and

"2. That the proposed development provides over-all standards of population densities, of open space, of circulation and offstreet parking, and other general conditions of use at least equivalent to those required by the terms of this ordinance in districts where similar uses are permitted, and

"3. That the proposed Precise Plan shall represent a development of sufficient harmony within itself and with adjacent areas to justify any exceptions to the normal regulations within this ordinance." (Ord. 161, § 3.7-E-8.)

authority to grant such approval, independently of the City Council and without any mandatory public hearings.[12] Likewise, the parties agree that the Planning Commission may not rezone property or otherwise effectuate any changes in the Millbrae zoning ordinances without acting in conjunction with the City Council in compliance with the notice and hearing procedures expressly required by Millbrae Ordinance 42, sections 4.6, 4.62, 4.63, 4.64 and former Government Code sections 65500-65805. (See *Hein* v. *City of Daly City,* 165 Cal. App.2d 401, 403 [332 P.2d 120]; *People* v. *Perez,* 214 Cal. App.2d Supp. 881, 886 [29 Cal.Rptr. 781].) From these basic rules, interveners argue that the approval of a Precise Plan falls in the same category as the issuance of use permits or the granting of variances and therefore that the Planning Commission acted in accordance with the controlling law; while plaintiffs argue, and the trial court agreed, that the changes wrought by the Precise Plan were so substantial that the approval of that plan was tantamount to amendment of the basic ordinances that zoned the property to PD.

Before proceeding further, it will be necessary to review the concept of planned unit development or PD districting in use in the City of Millbrae at all times here relevant. The technique of planned unit development is the development of land as a unit where it is desirable to apply regulations more flexible than those pertaining to other zoning classifications and to grant diversification in the location of structures and other site qualities.[13] It should be particularly noted that the PD district established constitutes a separate zoning district in

[12]The Planning Commission may grant use permits or variances. (*Johnston* v. *Board of Supervisors,* 31 Cal.2d 66, 73 [187 P.2d 686]; *Essick* v. *City of Los Angeles,* 34 Cal.2d 614, 623 [213 P.2d 492]; *Case* v. *City of Los Angeles,* 218 Cal.App.2d 36, 40 [32 Cal.Rptr. 271]; *Steiger* v. *Board of Supervisors,* 143 Cal.App.2d 352, 355-356 [300 P.2d 210]; and see Millbrae Ord. 42, § 4.21(a).) Public hearings on such exceptions to zoning ordinances are optional. (Millbrae Ord. 42, § 4.22; former Gov. Code, § 65951, as interpreted by 39 Ops.Cal.Atty.Gen. 58.)

[13]The Millbrae ordinance states that the purpose of PD districting is as follows: ''Where a special design proposal for a large scale development makes it desirable to apply regulations more flexible than those contained elsewhere in this ordinance, a Planned Unit Development or PD District may be established. The purpose of such district is to grant diversification in the location of structures and other site qualities while insuring adequate standards relating to public health, safety, welfare, comfort and convenience.'' (Millbrae Ord. 161, § 3.7-E-1; see California Land Security and Development, p. 601 (Cont. Ed. Bar 1960); and see, in general, Goldston and Scheuer, *Zoning of Planned Residential Developments* (1959) 73 Harv.L.Rev. 241; *Symposium: A Developer's View* (1965) 114 U.Pa.L.Rev. 3.

addition to the more conventional types of zoning districts such as R-1 (single family residential) and C-1 (light commercial). (See Millbrae Ord. 161, § 2.1.) The Millbrae zoning ordinances do not prescribe any specific use standards, restrictions, nor requirements applicable to PD districts other than limiting such districts to a minimum size of four acres and restricting the uses to those permitted in the other types of zoning districts existing in Millbrae, the significant feature of the PD district being that the several uses may be commingled. (See Ord. 161, §§ 3.7-2, 3.7-E-5.)

In the instant case interveners' predecessor accompanied its application for rezoning from R-1 classification to PD district with a general plan providing for the construction of seven six-story apartment buildings in Section A. Thereafter, on April 6, 1962, interveners filed an application to amend the general plan previously filed to provide for three high-rise apartment buildings and seven quadplexes. Although these plans are not part of the record we may assume that they contained the matters required by Ordinance No. 161 for general plans, since none of the parties contend otherwise. It is apparent, moreover, that these plans were treated as precise plans under the former provisions of the Government Code since they were approved by the Planning Commission and adopted by the City Council. It is not contended by either party that proper notices were not given nor hearings had with respect to the adoption of either of these plans; nor is the validity of the resolutions adopting them challenged except that plaintiffs assert the invalidity of the original rezoning from R-1 to PD and the accompanying general plan on the basis that the matter was not referred back to the Planning Commission. We have already discussed the merit of this contention in connection with plaintiffs' appeal. We are satisfied, moreover, that the record discloses that these ordinances were properly adopted pursuant to the ordinances providing for amendments to zoning classifications (§§ 3.7-E-4 of Ord. 161 and 4.6 of Ord. 42) which are consistent with and in conformity to former sections 65803 and 65804 of the Government Code providing for amendments to zoning codes in the same manner as the adoption of precise plans.

Plaintiffs urge that the ''general plan'' referred to in section 3.7-E-3 of Ordinance No. 161 has particular reference to the rezoning of property to the PD district and that the filing of such a plan with the application for rezoning is a prere-

quisite to such rezoning. We agree with this contention. In this connection we note that section 3.7-E which precedes section 3.7-E-3 specifically provides that "The following regulations shall apply in all Planned Unit Development Districts." We are satisfied, moreover, that it was proper and reasonable for the City of Millbrae to provide by the ordinance for the filing of a general plan delineating the matters specified in section 3.7-E-3 of Ordinance No. 161 as a condition for the change of classification to PD district in view of the broad powers conferred upon cities by the Legislature for the enactment of zoning ordinances under former section 65800[14] and the rule that every intendment is to be made in favor of zoning ordinances. (*Lockard* v. *City of Los Angeles*, 33 Cal.2d 453, 460-461 [202 P.2d 38, 7 A.L.R.2d 990] ; *Wilkins* v. *City of San Bernardino*, 29 Cal.2d 332, 337 [175 P.2d 542] ; see *Magruder* v. *City of Redwood*, 203 Cal. 665 [265 P. 806].)

It is apparent that with respect to the zoning of property to the PD classification or the rezoning of property already in a PD district the City of Millbrae required, at all times here pertinent, that the application for zoning or rezoning be accompanied by a precise plan based on the master or general plan as required by the former sections of the Government Code hereinbefore alluded to. Accordingly, in the present case at the time the Planning Commission was called upon to approve the "Project Precise Plan" the subject property was zoned PD district limited to the construction of three highrise apartments and seven quadplexes of a general size and at locations designated in the general plan and subject to the location and dimensions of the streets, parking areas and other open spaces as specified in the general plan. We note, further, that the four conditions imposed by the Planning Commission and the City Council upon which the zoning was made contingent were performed by interveners and that the evidence establishing such performance is sustained in the record.

Our immediate inquiry, therefore, is to ascertain the nature of the plan which was designated as the "Project Precise Plan." The thrust of our inquiry is whether, in addition to the matters which were properly the subject of the precise

[14]Former section 65800 provided in pertinent part that a city could by ordinance regulate the use of buildings and lands, the location, height, bulk, number of stories and size of buildings, the sizes of yards, courts and other open spaces, and the percentage of a lot which might be occupied by a building.

plan provided for in the ordinance and solely for the consideration of the Planning Commission, there was included therein substantial changes which were tantamount to a rezoning of the PD district as is contended by plaintiffs. As already noted, interveners urge that provision in the "Project Precise Plan" for seven additional apartments in the high-rise buildings, the reduction in size of the golf course, the increase in the number of parking spaces, and the relocation of two of the high-rise buildings amounted to nothing more than the issuance of a use permit or the granting of a variance, matters solely for the Planning Commission's determination. This determination is a question of law since it is dependent upon the interpretation of the provisions of the "Project Precise Plan" concerning which there is no dispute or ambiguity. Accordingly, under well-established principles we can make this determination for ourselves and we are not necessarily bound by the trial court's interpretation.

In our view, while the change in the number of apartments in each of the high-rise buildings would properly be the subject of the precise plan under the ordinance so long as it did not increase the "general size" of the buildings as delineated in the general plan, the other changes amount to a substantial alteration of the general plan since they materially and fundamentally change the location of two of the high-rise buildings and the size of the parking areas and the open areas. These were specific elements of the general plan incident to the zoning of the PD district and their change and alteration amounted to a rezoning of the district. We are persuaded to this conclusion by the very nature of the PD district. Although the creation of such a district allows for greater flexibility and diversification in the location of structures and other site qualities and their uses, once these elements are delineated in the general plan they constitute material and indispensable attributes of the district itself. In other words, the zoning characteristics of the district consist not only in the classification of the district to PD but in the components of the general plan accompanying the application for the creation of the district and any subsequent amendments to the plan that may properly be adopted. Accordingly, any substantial change or alteration in the actual physical characteristics of the district and its configuration amount to a rezoning of the district and may only be accomplished pursuant to the provisions of the state statutes and the local

ordinances consistent therewith providing· for zoning and rezoning:

The argument urged by interveners that the subject changes are analogous to the granting of a use permit or a. variance is not applicable here. The cases cited by them apply to situations where the property is validly zoned for a particular purpose and the variances or conditional uses are permitted as being within the scope and purpose of the zoning ordinance. Here, aside from the addition in the number of apartments· to be contained within the size of authorized buildings, the proposed changes do not constitute "use permits". amounting to permissible variances but are. substantial alterations in the zoning which is peculiarly indigenous to the established zoning district. ·

B. *Vested Rights*

 Interveners also argue that they have vested rights in the Precise Plan in that they have expended over $600,000 in developing the property pursuant to said plan, so that the City may not now withhold building permits under that plan. They rely upon cases which hold that a person who changes ' his position in reliance to a zoning ordinance and a permit issued pursuant thereto, and who has performed a material amount of work thereunder, has a vested right in such permit. (See *Griffin* v. *County of Marin,* 157 Cal.App.2d 507, 511-513 ' [321 P.2d 148] ; *Jones* v. *City of Los Angeles,* 211 Cal. 304, 306 [295 P. 14].) The instant case is distinguishable from the cases cited. In those cases the permittee was proceeding pursuant to a valid permit which was subsequently revoked. Here interveners proceeded under a permit which was invalid· when issued because it violated the zoning ordinance. (See *Williams* v. *City of San Bruno,* 217 Cal.App.2d 480, 486, 488, 491 [31 Cal.Rptr. 854].) Moreover, since we do not have the transcript before us, we have no way of ascertaining whether any of interveners' total expenditure would be wasted if they are not permitted to proceed in accordance with the changes or if they are required to secure a new precise plan. Interveners did not request any specific findings with respect to damages. Accordingly, the general finding that the sum of $600,000 was expended for plans in developing the property for streets, utilities, grading, and in the erection of two quad-' plexes is susceptible of the inference that these expenditures were for improvements in conformity with the general plan and a precise plan in conformity thereto.

## C. *Laches and Estoppel*

The trial court declined to apply the equitable remedy of laches and estoppel against plaintiffs because the substantial changes in the general plan were invalid and because Ham's position as City Engineer, part owner of the subject property, and as engineer for the developer amounted to a conflict of interest. As pointed out in our discussion of plaintiffs' appeal, there is no finding in the case that Ham did or did not participate in any contract involving the subject property in any official capacity. This issue must still be resolved. Suffice it to say, however, the question of laches, as already pointed out, must be determined in each case upon the basis of its facts and in the absence of a palpable abuse of discretion the trial court's finding on that issue will not be disturbed on appeal. Here the trial court found that changes in the general plan were made without public hearing or notice and that plaintiffs were not aware of the changes. ▮▮▮ Moreover, the defense of laches is intended to protect the innocent, not those who seek to circumvent a statutory provision to the detriment of another. (*Dowd* v. *Glenn,* 54 Cal.App.2d 748, 756 [129 P.2d 964] ; *Hovey* v. *Bradbury,* 112 Cal. 620, 623-625 [44 P. 1077].)

### *Conclusion*

It is therefore ordered that plaintiffs' "Motion to Strike Interveners Briefs and to Dismiss Interveners as Appellants and Respondents in this Appeal" and their "Motion to Strike, a Further Motion to Dismiss" be denied; that the judgment be reversed and that the cause be remanded to the trial court to set aside the judgment and the findings of fact and conclusions of law; to receive evidence on the limited issue of Ham's conflict of interest if the trial court shall in its discretion deem the reception of such evidence necessary; and, thereupon, having reexamined and redetermined this limited issue, to make and file findings of fact on *all* the issues in the case in conformity with the views herein expressed based upon the evidence before it and such additional evidence, if any, which the trial court may have received; to draw proper conclusions of law therefrom; and to enter judgment accordingly. Plaintiffs and interveners shall bear their own costs on appeal.

Sims, J., and Elkington, J., concurred.

The petition of plaintiff and appellant Saum for a hearing by the Supreme Court was denied July 10, 1968.